23-11033. All right, we've got Ms. Reese for the appellant, Mr. Pallas for the appellee. Ms. Reese, whenever you're ready. Good morning, May it please the Court, Counsel, my name is Rachel Reese and I represent the appellant, Kenard Singh. Mr. Singh is currently serving a life sentence in the Florida Department of Corrections after he had essentially no counsel, not even equivalent to ineffective counsel, at a motion to vacate his plea and sentence after there was an alleged violation of his plea agreement. At the time of the state's motion, it was alleged that Mr. Singh had entered into a very favorable plea agreement after he had made incriminating statements from day one of his pending case. He had agreed to testify against his co-defendant and after he entered into that plea, he was essentially, I would submit it as abandoned. His attorney did not speak with him thereafter, did not visit him at the county jail. He, for several months, was enduring some threats, concerns and was afraid to testify but he ultimately did, without counsel present at all, he . . . But that's not what we're here about today, is it? We're here because you think, you contend that chronic presumptions should apply as opposed to the analysis pursuant to Strickland? Yes, Judge Huck. Let me read a head note from chronic. Sixth Amendment does not require that counsel do what is impossible or unethical. If there's no bona fide defense to a charge, counsel cannot create one and may disservice the interest of his clients by attempting a useless charade. My question is, what should Mr. Morrow have done that he didn't do? I think that's an interesting point because there's a lot of things I think that in hindsight, which we're not technically supposed to be doing, we're not playing Monday morning quarterback, which is arguably what happened at the lower court when the public defender who did ultimately represent Mr. Singh at the trial testified to and the things that they would have done differently. I think that what Mr. Morrow failed to do was to adequately recognize the conflict that he had with Mr. Singh, ask the court to relieve him in that moment or get a continuance. Arguably Mr. Morrow did try to get off of the case and obviously Judge Lambert was not on board with that suggestion. In your briefs, you talk about he should have gotten a request of continuance and then what? At that point in time, he could have actually tried to prepare and I know that there is some testimony . . . I'm trying to think. What is it specifically that he did or didn't do that he could have done two weeks later? As put forth and I think that is one of the actual interesting points that we have here is that we do have evidence from another attorney's perspective of what they did do later. They went back through, they spoke with Mr. Singh. Mr. Morrow had no idea about the situations that Mr. Singh had dealt with at the county jail in terms of the actual fear that he suffered from. He had no idea about his mental status. I believe there was some mention about his mental disability, his age and he also had not even been present at the trial itself. Understandably so, there is significant record evidence that Judge Lambert obviously had presided. I'm still not sure what act, what motion should Mr. Morrow have entered or made with the trial judge. Let me tell you, it seems to me he was put in a very difficult situation. A judge who, in this case, in kind of a unique situation, you know the judge having to rule on the motion to vacate the plea and the sentencing, but the judge is also the key witness, right? The judge sat through the trial, listened to your client's testimony, had a copy of the plea agreement and the requirements and pretty obvious this judge was very vocal to say the least. He made it pretty clear to Mr. Morrow after he appointed Mr. Morrow to come back into the case, so to speak, that he didn't believe that your client had complied with the terms of the plea agreement. I mean, he was extremely firm on that position, and that put Mr. Morrow in a very difficult situation. Mr. Morrow's theory or strategy was, well, I see where the judge is going. The judge is going to believe his own view of what happened there over anything else. Nothing else he could put in the evidence plus the phone call that your client made admitting that he tried to help the defendant in the trial. I just don't see what Mr. Morrow could have done anything differently. As a matter of fact, I think his strategy was probably the best strategy possible. He got the judge to set aside not only the sentence, but the plea which allowed your client to be represented by somebody else, but then negotiated a deal, not as good as the first deal which was down to twenty-one months, but thirty-one months. It seems to me, in retrospect, that was the best strategy possible. And I don't disagree with that, Your Honor. I think, though, and the unfortunate part in this is that I would respectfully submit that that strategy from the record evidence that we have is something that was developed in hindsight. In that moment, Mr. Morrow had no intentions whatsoever of representing Mr. Singh. He was in the audience. He was not sat at the defense table. Obviously, he was put in a very uncomfortable position, but I think the things that could have been found out, and I think this is reflective in Judge Lambert's actual order which is referred to in the appellee's brief, he says, it is a completely unmitigated substantial noncompliance with the agreement. I think the unmitigated part is really important. There is oftentimes where these situations and the mitigation that we did learn later on from the motion that was filed several, several, several months later by the Public Defender's Office, identifying why this was not a substantial noncompliance with the agreement, trying to actually . . . I think that it's important to separate this motion hearing into two parts. There was the first part of was there compliance or was there substantial noncompliance? And if there was noncompliance, what is the remedy? And I think that with Mr. Morrow, he failed in the first part. He arguably, at the evidentiary hearing for the post-conviction motion, he did discuss the fact that he had reviewed the case law and things of that nature, but that was only towards what remedy would be more appropriate. And I agree, he strategically, to get rid of both of them, especially understanding what Judge Lambert's position was and how he was audibly very unsatisfied with Mr. Singh, that was the right strategic choice for that. The problem is with the first part of that, it should have never gotten to that second remedy stage. He did not make a single, I don't even think that he made a single sound during the entire first portion. He had not heard the jail calls until in the hearing. He never even asked Mr. Singh if he was okay with representing him. I know there was a lot of discussion and the fact that Mr. Singh did not object. However, in that situation, I think that it's reasonable to understand that if you're not blatantly asked a question of whether or not you're okay with that. Yes, Judge. If chronic doesn't apply, restriction applies, does that pass, does Mr. Murrow pass a message under that? I think that Mr. Murrow, in this case, recognizes she had never filed a motion like this after securing the conviction that she was seeking. That was the entire principle and the whole purpose of offering this plea agreement. I understand the point that he was offered a second plea offer after this whole thing was undone. I cannot speak to that and I don't think that that necessarily dictates one way or the other. I think that the overall argument and the overall concern is the fact that there was this obvious conflict in so many respects, even up to the evidentiary hearing several years later. Mr. Murrow, until . . . Let me go back. My recollection is his subsequent counsel filed a motion to accuse the judge. Yes. I'm assuming they saw the writing on the wall just as Mr. Murrow did. Judge Lambert was pretty firm in his view that there had been a breach of the content of his plea agreement. I just don't see what Mr. Murrow could have done any differently. It's hard to look back in hindsight. I recognize that and I think that, again, being put in a tough situation can be a very sticky mess. In this situation, Mr. Murrow had a choice. He had a choice to either absolutely defend his client to the ends of time or he could stay in good graces with Judge Lambert and it is our position that that is what he decided to do, was the latter. He saw that Judge Lambert was not happy with his client's noncompliance with this agreement which, again, pursuant to our pleadings, we would suggest that that's not the case and if he would have argued . . . if he would have either sought more time, sought to withdraw in that moment, which Judge Lambert said, if you represent him right now, we will let you withdraw afterwards. If that's not a conflict, I'm not quite sure what is. He, until the evidentiary hearing, wanted . . . he was . . . oh, you're assuming that I was his attorney and was very much in line with that thought that he still, several years later, was convinced that he was not representing Mr. Singh in that moment. How can that not be seen as something that under Chronic is a complete lack of representation? So, as it relates to that first portion of that hearing, it is our position that this is one of those rare situations where we do fall within Chronic and I see that my time is running out. So, thank you. Very well. You've got some rebuttal time coming. Mr. Pallas, let's hear from you. May it please the Court, Opposing Counsel, my name is Richard Pallas. I represent Appellees, the Secretary, Attorney General in the State of Florida. This case is strickland. This does not fall within the confines of Chronic. It was not an unreasonable application of clearly established federal law when the State Post-Conviction Court rejected these Chronic claims. There's talk of this being two separate matters during the motion to vacate. This is one matter. This needs to be considered in the grand scheme of the motion to vacate, not an evidentiary portion versus remedy portion. And I believe it's telling that we have discussed here today that this would be a hard sell under Strickland. I think if this is a hard sell under Strickland, we can't possibly put this under the Chronic. If we can't, if we cannot. Well, isn't the point of Chronic to say that sometimes you just can't, you don't, I mean, the presumption of prejudice applies because we don't know what would have happened had a lawyer actually been doing his job, right? I mean, here, it's just such an, like, here, the lawyer has basically abandoned his client. He negotiates this plea deal for his client, and then he lets his client testify without showing up to advise him or anything. And then, you know, unsurprisingly, the client gets himself in trouble, and then the prosecution moves to undo the plea deal that the lawyer negotiated, and he doesn't show up to do anything with that either. So it just really seems like from the point that the plea deal was negotiated, the client is abandoned. And then it's kind of hard to figure out what would have happened had he actually had a  Well, Your Honor, the state would dispute that he was effectively abandoned at least up until the expiration of the 30 days after the plea and sentence were, the plea was accepted and then the sentence was imposed by the trial court. At that point, under, I believe, Florida rule of general practice, Judicial Administration 2505, counsel was only meant to stay on for 30 days, unless, of course, appellate paperwork was required and the like. Is that, and so, I mean, I've never seen a case quite like this. Usually, the ones that I've seen, you negotiate the plea deal, the sentencing doesn't come until after the testimony. You know, that's when the guilty plea, because you want to make sure the guy does what he's supposed to do. Yes, Your Honor. Is this the way this happens in state court? Is you negotiate the plea deal, the plea deal is finalized, the sentence is imposed, and then the lawyer just goes off? Is this like a usual thing that happens? Your Honor, I would argue that most of the time I have seen conditional plea offers based on truthful testimony, sentencing is set off in most of the times. In fact, this was, I think, testified in detail at the Rule 3850 hearing by trial counsel and to a certain extent by appellant himself, that trial counsel jumped on this opportunity, that he was used to these proceedings requiring to wait for sentencing until the defendant met the condition precedent of this agreement. Here he could get that particular deal, and not only did the express terms of this plea deal say, testified truthfully and consistently with his proffer, the assistant state attorney at that plea colloquy stated, you are admitting here that that was the truth at the proffer, and the defendant answered that affirmatively, which under our Florida state law, that is all expressed portions of his plea agreement. So this is, the state recognizes that this is a little sticky in terms of our procedure here that at a certain point, trial counsel stopped representing him 30 days after he entered the plea colloquy, then about, I want to say, six months later is when the trial came. Now, it's important that some of the things alleged here, like he may not have, his non-compliance wasn't substantial because he was being threatened, or certain mental health issues, none of that was ever brought up to him when he said that he met him, they just spoke generally. He wasn't helping him go along with it, but the defendant also testified at that rule 3850 hearing that the assistant state attorney did go over the proffer with him, and of course, the defendant was deposed by trial counsel for Mr. Crabtree as well in this case. So he was very well aware of what the truth had to be here and what he had to testify to. Now, this all being said, and while I cannot present a rule of procedure currently, whether under Florida Rule of Criminal Procedure 3111, which was cited by trial counsel, or the 2505 of General Practice Judicial Administration, fact of the matter is, trial court looked at this as almost being revived of his counsel, because of course, in the event that this plea is withdrawn, we're either starting over at a critical stage of the proceeding, which would be sentencing, or we would be going into him beginning trial all over again and requiring the effective assistance of counsel. I think it's, while he stated that he did not review, well, there was testimony that he said he read it at the end of the portion of this hearing, but then, of course, said he had not seen it yet in the trial. The state's motion to vacate had not yet incorporated the transcript of Mr. Crabtree's trial. He could read the room. The language speaks for itself at the hearing, speaking of visceral reactions and the like. I mean, the state filed its motion, he testified, trial counsel testified that they were going to file a motion for vacate, so he knew that he had not held up his end of the deal. It is Strickland 101 that a meritless motion is not going to equate to ineffective assistance of counsel, and here, filing that motion for continuance, asking for more time, it would not be granted, and it's important that Strickland does not, had you made this motion, it was denied, you would proceed on appeal. We're dealing with prejudice at the time of the hearing. What would have happened for him? He would not have gotten this continuance. Yeah, I guess, and that's, I mean, I think as Strickland applies, I mean, you know, that's why we granted the COA on whether Cronick should apply, and that seems to be the nub of the issue here. And I guess, so Cronick, or I guess it's Nixon, says that Cronick applies when there's a failure to function in any meaningful sense as the government's adversary. Is that what happened here, in the sense that counsel said, look, I didn't even think I was representing this guy anymore, and then the judge kind of called me up there, and I was just there. It didn't, what do you say about that? No, Your Honor. I don't believe that this shows that he was not acting as the adversary. I believe we're dealing with the second situation contemplated under Cronick, which is that trial counsel entirely failed to subject the state's burden to adversarial meaningful testing. And that's not what happened here. In fact, under Florida versus Nixon, a similar situation had occurred, except in the vein of a death penalty case, and the fact that trial counsel essentially conceded guilt at that trial. He was not fighting the evidence. It was very overwhelming that Nixon had performed those murders. He thought it was better to focus more on mercy and, I believe, win some favor over with the jury, look to be a more credible counsel towards the jury in advocating to spare Nixon's life. And that was found to not fall under the Cronick presumptions. He focused on the sentencing proceeding, not the actual finding of guilt. And those are, of course, two bifurcated proceedings that happen in death penalty trials. The state mentioned earlier here that we were dealing with, this is not two separate portions of one motion to vacate hearing. This is just one grand scheme motion to vacate. And here, while he did not say anything to the effect of, I don't believe there was substantial noncompliance, for one, I would argue that it would be meritless to say so. I think that the motion for reconsideration was raised. It raised these arguments to, for lack of better phrase, splitting hairs with what he did testify to versus his proffer. It was substantial noncompliance because he was taking the gun visually out of his co-defendant's  Now, instead of focusing on that and not appearing credible before the judge, he went for what he testified was the best possible situation, was the fact that this defendant got a 21-year plea deal in order to testify to avoid going to trial and facing a mandatory life sentence for first-degree murder based on felony murder of attempted robbery. Here instead, he said, let's try to get him another deal. It's not going to be from me. He needs it to be a public defender or some different attorney with fresh eyes on this. In hindsight, he had the right idea here to focus on this. Because the judge, instead of saying, I'm going to sentence him right now for a crime of which he could still receive life, of which might open us up to a chronic situation, had he forced Mr. Morrow, trial counsel, to stay on his representation during a sentencing hearing to happen right then and there. That's not what happened. Instead, he had a chance to get another opportunity to see daylight outside of the Florida Department of Corrections. And unfortunately, appellant did not bite on that. He received a 40-year plea deal. Successor counsel, public defender Graves, actually testified at the Rule 3850 hearing that he reached out to, I believe, the chief deputy in the state attorney's office to negotiate a lower deal based on their mental health mitigation, and of which they were then given a 35-year plea deal. It was testified at the beginning of appellant's trial that he had rejected it. And then there was, I believe, audio played from a hearing pretrial for appellant's trial where the deal was put more in detail on the record with advice from counsel and appellant indicating that he would not accept it. So I believe here we do not fall within a form of chronic as contemplated by Nixon as violating the Sixth Amendment. I think we fall within Florida versus Nixon in the fail that this is not a chronic situation, it is Strickland, and we would not apply the presumption of prejudice, your honor. If this court has no other questions regarding this case, I will rely on the state's brief, and I ask that you affirm. Okay, very well. Thank you so much. Ms. Reese, you've got five minutes remaining. Thank you. I'm starting, the appellee makes a comment about the effectively of being abandoned and the fact that Mr. Morrow only was meant to stay on for 30 days unless there was a health paperwork to be filed, and there was some discussions about the rule that was cited by Mr. Morrow in his notice of non-representation. I think the timeline of that is actually extremely important for this analysis. It shows, we can infer what his intentions were, what his thought process was in the moment. Under Rule 3.111, you have to file a motion to withdraw. In this situation, Mr. Singh entered his plea on March 27th of 2013, so that would have put him at April 26th of 2013 to enter a notice of appeal, which obviously he did not do. This is an unusual set of circumstances for a plea. In the state courts, at least from those that I have experienced, it is the norm to enter a plea, especially if it's going to be subject to the sort of condition to be sentenced later on. Mr. Morrow even testified that if that had happened, he would have recognized that he still represented Mr. Singh through the trial, which I find very, very interesting as well, and again, in front of what his intentions were. He filed his notice of non-representation five days after Mr. Crabtree's trial. So Mr. Singh testified on May the 8th. He filed his notice on May the 13th of the non-representation at the evidentiary hearing for the post-conviction motion. It was learned that there was a phone call from the state attorney's office made to Mr. Morrow, letting him know that they were going to be filing this motion. Again, I don't think that the record says when that phone call was, but a couple days after he filed his notice of non-representation, the state filed their motion on the 17th, and then the hearing was held on the 21st. I would submit that if Mr. Morrow actually believed that he was not Mr. Singh's attorney anymore, he would have filed a motion to withdraw, or even the same notice, 30 days after the case would have actually been over. And instead, he allowed one of his associates to go to a deposition. He had several other things that solidified the fact that he was still Mr. Singh's attorney, at least in his mind in the moment. And the reason that that's important is because in order for this to be, we keep kind of talking about this strategy, and in order for a strategy to be reasonable or to justify anything, because if it was a strategy, I can see that this, under a strict rule, it wouldn't be chronic. Because if it's any sort of strategy, it fails. That's what all the case law says. On the cases that were cited by the state, they discuss similar situations and strategies that counsel had. So for example, failure to impeach, I think, was a couple of the cases. And the court said, in those situations, just because counsel fell short on their strategy, a strategy means it is not under chronic, unfortunately. But in this situation, counsel didn't have a strategy, because in order to be strategic, you have to actually think about other opportunities and other possibilities beforehand. And counsel did not do that, because it was only when counsel learned that Mr. Singh was about to cause a massive mess, if you will, for him with Judge Lambert, that he filed his notice of non-representation, which, again, under the rules, is not even the appropriate standard. So our position is still that there was absolutely an abandonment of Mr. Singh, and this is the very type of representation, but not representation, that would fit under chronic. And again, I do submit that the records before this court suggest that there are two parts to the hearing, which I think is something that has been overlooked significantly, because the non-compliance part is extremely important. Can I ask you a question? Even if you can sort of bifurcate the proceeding in the way that you propose, why isn't Nixon then pretty close? I mean, Nixon was, in fact, the bifurcated proceeding, at which, sort of at stage one, the guy said, never mind. And at stage two, he sort of poured everything he had into stage two, so why isn't that comparable? I think in this situation, it's factually distinguishable, because of the fact that the first portion of this matter, which is obviously the portion where we argue that Mr. Marr was completely absent, he just stood there and did not make a single argument whatsoever in favor of Mr. Singh, and he actually acknowledged that at the hearing. I think that it was, even if it's bifurcated, the damage had already been done at that point in time. And that is why it was so important for either to get a continuance, lay a record, anything, especially understanding the fact that Judge Lambert had already said, I will grant your motion to withdraw when this is over if you represent Mr. Singh. End of story. I think that that comment, in and of itself, speaks volumes about the intentions of everybody that was there and the understandings of what happened. And candidly, at the court, I don't think that Mr. Singh's rejection of a plea offer thereafter has, under the chronic standard, I don't think it has any relevance whatsoever, because obviously, in terms of the prejudice, this is a situation where prejudice is presumed, because Mr. Marr's failure to represent him, it renders this entire critical stage, which this was the most critical stage for Mr. Singh, besides the trial where he got found guilty and was sentenced to life, it made this entire matter fundamentally unfair. And I see that my time has expired. I would ask that you vacate the District Court's order in favor for Mr. Singh. Thank you. Thank you very well. Thank you both. The case is submitted. We'll move to the third and final case of the day.